**DELOITTE & TOUCHE, Appellants,**

v.

**Harvill E. WELLER, Jr. and Frederick B. Wookey, Jr., Appellees.**

**No. 07–96–0324–CV.**

Court of Appeals of Texas, Amarillo.

April 14, 1998.

against appellant Deloitte & Touche (Deloitte) for alleged negligence in preparing the partnership's tax return. In 15 points, Deloitte contends the trial court erred in rendering judgment against it for interest paid on back taxes to the Internal Revenue Service and for exemplary damages. For reasons we later express, we must reverse the judgment of the trial court and render judgment that appellees take nothing.

A proper consideration of Deloitte's challenges requires us to recount the factual and procedural history of this dispute. In 1986, the Granada 4 limited partnership consisted of 10,358 limited partners and one general partner, Granada Management Corporation (GMC). Granada 4 was designed and operated as a registered tax shelter for the limited partners. The partnership obtained tax benefits deferring and converting ordinary income into capital gains by investing in joint ventures involving agriculture. Several of these joint ventures were with other limited partnerships formed by GMC.

One of the joint ventures in which Granada 4 invested in 1986 involved the purchase of 800,000 cattle to graze on land leased by the partnership. The objective was to permit the partnership, and consequently the partners, to take a deduction for the cost of keeping the cattle at pasture. This deduction is referred to as the pasturage deduction. At the end of 1986, GMC hired Deloitte to prepare and sign the partnership's 1986 tax return. That return included a 95 million dollar pasturage deduction. It was signed by Deloitte partner Ben Anderson.[1] Based on information provided to them in K–1 forms sent out by GMC, the limited partners took deductions on their individual returns in proportion to their investment in the partnership.

The Internal Revenue Service (IRS) subsequently audited the 1986 returns of Granada 4 and the joint ventures in which it had invested. As a result of the audits, the IRS disallowed numerous deductions taken by these entities. The disallowed deduction that is the primary focus of this litigation is the pasturage deduction. The IRS determined

Beck Redden & Secrest (David J. Beck) Woodard Hall & Prim (Robert M. Corn) Houston, Gibson Dunn & Crutcher (John T. Behrendt) Dallas, Gibson Dunn & Crutcher (Theodore B. Olson), Washington, DC, for appellant.

Susman Godfrey LLP (H. Lee Godfrey, Kenneth E. McNeil, Geoffrey L. Harrison), Franklin Cardwell & Jones (Gregory N. Jones and Ronald G. Franklin), Houston, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

## ON MOTIONS FOR REHEARING

BOYD, Chief Justice.

In response to the motions for rehearing filed by both parties to this appeal, we withdraw our opinion of September 16, 1997, and substitute the following opinion in its place.

This appeal arises from a class action brought by limited partner investors in Granada 4, a Texas limited partnership formed to engage in agriculture and food production. Harvill E. Weller, Jr. and Frederick B. Wookey, Jr. are the representative members of the appellee class. The suit was brought

1. Anderson also signed the returns of the joint ventures in which Granada 4 invested.

that there was no, or at least inadequate, evidence showing that the joint ventures owned cattle at pasture in 1986. On April 10, 1990, the IRS sent notices of deficiency, each entitled Final Partnership Administrative Adjustment (FPAA) to three of the joint ventures. A corresponding notice was sent to Granada 4 the following month. GMC informed the limited partners of the FPAA and GMC's challenge thereto on May 30, 1990.

On November 15, 1991, GMC entered into three settlement agreements with the IRS, one for each of the joint ventures whose deductions were disallowed. The disallowed deductions totaled 79 million dollars. The pasturage deductions accounted for only a portion of this amount but, appellees contend, the partnership's position was so weak on that issue that it was forced into a settlement. Because the settlements avoided the imposition of substantial penalties by the IRS, there is no dispute whether the settlements were appropriate.

The IRS assessed back taxes and interest against the limited partners. Appellees Harvell E. Weller, Jr. and Frederick B. Wookey, Jr., acting as representative members of a class consisting of all the limited partners in the Granada 4 limited partnership, filed suit against Deloitte on May 26, 1992. In the suit, appellees claimed Deloitte was negligent and grossly negligent in the preparation of the partnership's 1986 tax return by failing to investigate the basis for the deductions asserted by the partnership. They further alleged that Deloitte knew there were no records supporting the pasturage deduction before it signed the 1986 tax return and that it attempted to conceal this fact by generating false documentary evidence showing that the partnership had cattle at pasture when in fact it did not. In the suit, appellees sought actual damages of over 34 million dollars, exemplary damages and pre- and post-judgment interest.

Because the trial court believed that determining the amount of actual damages would not present a fact question, the parties went to trial on the issues of liability and exemplary damages beginning October 26, 1993. On November 1, 1993, the jury returned a verdict finding Deloitte and the "Granada Entities"[2] negligent, that their negligence proximately caused "the occurrence in question," and assigning 60 percent responsibility to Deloitte and 40 percent to the Granada entities. The jury also found Deloitte's negligence to be gross negligence and found $77,685,000 in exemplary damages. The question of actual damages was resolved pursuant to a claims procedure advocated by appellees. Under the plan, appellees would bear the expense of notifying the class members, collect documentation of the amount of interest assessed by the IRS, total the results and present this information to the court. The trial court suggested that the question of actual damages be resolved by "something that looks like a summary judgment proceeding" so that an appellate court would know how to analyze it.

On September 26, 1994, appellees filed their motion for summary judgment on the issue of actual damages. On December 13, 1994, the trial court sent a letter to the parties setting out its intended disposition of the remaining issues. On January 27, 1995, the trial court granted appellees' motion for partial summary judgment on actual damages and also rendered a final judgment in the suit. That judgment awarded appellees $79,010,955.73 plus post-judgment interest of 10 percent per annum and costs.

In its first point, Deloitte argues appellees' cause of action was time barred because the suit was filed outside the two-year statute of limitations for causes of action based on negligence. *See* Tex. Civ. Prac. & Rem.Code Ann. § 16.003 (Vernon 1986 & Supp.1998). On April 10, 1990, the IRS issued FPAA notices of deficiency to each of the three joint ventures in which Granada 4 had invested. On May 7, 1990, the IRS mailed the notices to GMC, which was serving as the general partner and the "Tax Matters Partner" for the Granada 4 limited partnership. GMC received the FPAAs on May 12, 1990, and notified the limited partners on May 30, 1990 of the FPAAs and of a petition which had

---

**2.** These were defined to include GMC, Granada Cattle Services, Inc., Granada Corporation, Inc., the Granada 4 partnership, and their agents, employees, officers, and directors.

been filed in Tax Court challenging the IRS adjustments. On November 15, 1991, GMC entered into settlements with the IRS resulting in disallowances of $79 million worth of Granada 4 tax deductions. Assessments were subsequently sent to each of the limited partners for their 1986 tax liability and interest. As we have noted, this suit was filed on May 26, 1992.

Deloitte argues the statute of limitations began running on May 7, 1990, when the IRS mailed the FPAAs to Granada. Alternatively, Deloitte argues the statute of limitations began running on May 12, 1990, when GMC received the FPAAs. Of course, if we were to adopt either argument, the suit, having been filed on May 26, 1992, would be time barred.

The purpose of statutes of limitation is to bar the adjudication of suits filed at a time far removed from the injury causing event. This is to prevent the consideration of stale claims and other inefficiencies and imprecisions associated with delayed litigation. The statute of limitations begins to run when a cause of action accrues. Tex. Civ. Prac. & Rem.Code Ann. § 16.003(a) (Vernon Supp. 1998). In *Atkins v. Crosland,* 417 S.W.2d 150, 153 (Tex.1967), the Supreme Court of Texas stated the general rule that:

> [A] cause of action sounding in tort accrues, in the absence of a statute to the contrary or fraudulent concealment, when the tort is committed. This rule obtains notwithstanding the fact that the damages, or their extent, are not ascertainable until a later date.... *A legal injury must be sustained, of course, before a cause of action arises.*

■ *Atkins,* 417 S.W.2d at 153 (citations omitted) (emphasis added). It has long been the rule that a legal injury in tort occurs when the tort is committed and damage suffered. *Black v. Wills,* 758 S.W.2d 809, 816 (Tex.App.—Dallas 1988, no writ). It has also been the rule that a cause of action only accrues when facts come into existence supporting each element of the tort. *Murray v. San Jacinto Agency, Inc.,* 800 S.W.2d 826, 828 (Tex.1990); *Stroud v. VBFSB Holding Corp.,* 917 S.W.2d 75, 80 (Tex.App.—San Antonio 1996, writ denied).

■ A claim for professional malpractice is based in negligence. *See e.g., Cosgrove v. Grimes,* 774 S.W.2d 662, 664 (Tex. 1989). The elements of a cause of action for negligence are well established. They are: 1) a legal duty owed by one person to another; 2) a breach of that duty; 3) the breach was an actual cause of injury; and 4) actual injury. *Alm v. Aluminum Co. of America,* 717 S.W.2d 588, 595 (Tex.1986). *See also Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990) (restated as three elements). Because actual injury is an element of a negligence claim, "[a]n action for negligence cannot be maintained unless some damages result therefrom." *Johnson v. Sovereign Camp., W.O.W.,* 125 Tex. 329, 83 S.W.2d 605, 608 (1935), *overruled on other grounds, Doctors Hospital Facilities v. Fifth Court of Appeals,* 750 S.W.2d 177 (Tex.1988). *Atkins* and *Johnson* show that Texas has followed the general principle that a plaintiff must show actual damage to maintain a negligence action. *See* PROSSER ON TORTS, § 30, at 165 (5th ed.1984); 22 Am.Jur.2d *Damages,* §§ 18, 131 (1988); Restatement (Second) of Torts, 906(c) (1965). Until such damages exist, the plaintiff's cause of action has not yet accrued. *Atkins,* 417 S.W.2d at 153; *Philips v. Giles,* 620 S.W.2d 750, 751 (Tex. Civ.App.—Dallas 1981, no writ).

*Atkins* illustrated these rules. In *Atkins,* the IRS commissioner assessed a tax deficiency against the plaintiff after the defendant, an accountant employed by the plaintiff, changed the method by which the plaintiff's income taxes were calculated without first informing the commissioner. The plaintiff subsequently brought a negligence claim against the defendant and sought damages for the amount of the adjustment assessed by the commissioner. The defendant affirmatively pled the statute of limitations with the claim it barred the plaintiff's cause of action. Our supreme court reiterated the following test concerning the triggering of the statute of limitations for a cause of action in tort:

> The test to determine when the statute of limitations begins to run against an action sounding in tort is whether the act causing

the damage does or does not of itself constitute a legal injury, that is, an injury giving rise to a cause of action because it is an invasion of some right of plaintiff. If the act is of itself not unlawful in this sense, and plaintiff sues to recover damages subsequently accruing from, and consequent on, the act, the cause of action accrues, and the statute begins to run, when, and only when, the damages are sustained; and this is true although at the time the act is done it is apparent that injury will inevitably result.

If, however, the act of which the injury is the natural sequence is of itself a legal injury to plaintiff, a completed wrong, the cause of action accrues and the statute begins to run from the time the act is committed, even where little, if any, actual damage occurs immediately on commission of the tort.

*Atkins*, 417 S.W.2d at 153 (quoting 54 C.J.S. *Limitations of Actions* § 168). In applying these principles to the facts of that case, the court wrote:

[W]e have concluded that the plaintiff's cause of action did not arise until the tax deficiency was assessed by the Commissioner of Internal Revenue. Prior to assessment the plaintiff had not been injured. That is, assessment was the factor essential to consummate the wrong—only then was the tort complained of completed. If a deficiency had never been assessed, the plaintiff would not have been harmed and therefore would have had no cause of action. Thus, the use of the cash method, as opposed to the accrual method, was not in itself the type of unlawful act which, upon its commission, would set the statute in motion. In short, in the absence of assessment, injury would not have inevitably resulted.

*Atkins*, 417 S.W.2d at 153.

On original submission we held that appellees' cause of action did not accrue until assessments were issued to them by the IRS. Although these assessments were issued over a period of time, they were all issued within two years before suit was filed. This holding was based on the opinion in *Atkins*, the lack of finality in the IRS notices of deficiency, and the other cases discussing the accrual of negligence causes of action.

On December 11, 1997, our supreme court issued its opinion in *Murphy v. Campbell*, 964 S.W.2d 265 (Tex.1997) (rehearing pending).[3] In that five to four decision, the court held that "[a] person suffers legal injury from faulty professional advice when the advice is taken." *Id.* It also held that the discovery rule could, and in such cases often would, delay the accrual until the plaintiff knew or in the exercise of reasonable diligence should have known of the wrongful act and resulting injury. *Id.* In tax accounting malpractice cases like *Murphy*, the court held that a claimant's discovery of his injury "cannot occur later than the receipt of the [IRS] deficiency notice [ ]." *Id.* The court disposed of the conflicting language in *Atkins* by stating that, although the opinion said an accounting malpractice claim accrues when the IRS issues an assessment, it "did not mean the final assessment but rather, the earlier deficiency notice." *Id.*

As an intermediate appellate court we must, of course, apply the law as stated by our state supreme court. The difficulties that might arise in applying the court's new rule are not present in this case and therefore do not merit discussion here. The question now before us is when the appellee limited partners in Granada 4 knew or in the exercise of reasonable diligence should have known of the wrongful act and their injury. More specifically, did the notices of deficiency sent to Granada on May 7, 1990, and received by GMC on May 12, 1990, commence the limitations period or did the discovery rule preclude accrual of appellees' cause of action until they were notified by GMC after May 30, 1990?

It is Deloitte's position that appellees' cause of action could not have accrued later than the date notice of deficiency was mailed to the "tax matters partner," GMC. This

---

**3.** Parenthetically, it is worth noting that appellant Deloitte and Touche was a defendant in *Murphy*.

argument is premised on Deloitte's belief that notice to GMC is imputed to each of the limited partners. In support, Deloitte cites section 6226 of the tax code for the proposition that the date an FPAA is sent to a tax matters partner commences the limitations period for challenges by both the partnership and individual partners. 26 U.S.C. 6226. It also cites one sentence from a congressional report concerning tax code section 6223 in support of its position that "notice to a tax matters partner is treated as notice to [the individual] partners." H.R. Conf. Rep. No. 97–760, 97th Cong., 2d Sess. at 601, reprinted in 1982 U.S.C.C.A.N. 1190, 1373 (1982).

There are two reasons why Deloitte's arguments are unpersuasive. First, the cited tax code provisions address the procedural aspects of disputes between taxpayers and the IRS. They have no applicability to a state law tort action between taxpayers and third parties. Regardless of the degree to which the substantive legal issues in this case depend on federal tax law, they arise in the context of a tort action in state court and procedural issues, such as limitations, must be resolved pursuant to state law. *See e.g., Bell v. Showa Denko K.K.*, 899 S.W.2d 749, 757 (Tex.App.—Amarillo 1995, writ denied). Moreover, contrary to Deloitte's assertions, the tax code does not impute notice given to tax matters partners to limited partners. The code is clearly designed to provide partners with actual notice of IRS actions. Section 6223(a) of the tax code directs the IRS to send notice of an FPAA to each member of a partnership individually, unless there are more than 100 partners and the individual partner owns less than one percent interest in partnership profits. 26 U.S.C. § 6223(a). In the event there are more than 100 partners, the tax matters partner is specifically directed to keep the individual partners informed of IRS proceedings by virtue of section 6223(g).[4]

■ In order to decide when the plaintiffs' claims accrued under the discovery rule, we must determine whether knowledge by a general partner can be imputed to limited partners for purposes of the discovery rule.

Appellees have failed to cite any authority holding that a party's knowledge of his injury cannot be imputed. Two cases support the position that such knowledge can be imputed. In *Willis v. Maverick*, 760 S.W.2d 642 (Tex.1988), and in applying the discovery rule to legal malpractice claims, our supreme court noted the unfairness of beginning the limitations period for such actions "notwithstanding [ ] the lack of knowledge, actual or *constructive*, on the part of the client." (emphasis added). *Id.* at 646. Thus, by its comment, the court recognized the possibility of imputed knowledge. In *Knowlton v. U.S. Brass Corp.*, 864 S.W.2d 585 (Tex.App.—Houston 1993), reversed on other grounds, *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644 (Tex.1996), the defendant, a manufacturer of residential plumbing, argued that the plaintiff homeowners' claims were barred by limitations, and those plaintiffs could not rely on the discovery rule because the knowledge of the prior owners of the homes was imputed to them. 864 S.W.2d at 606. The court of appeals in its discussion assumed that knowledge could be imputed for purposes of the discovery rule, but declined to do so based on a lack of privity between the plaintiffs and the prior owners. *Id.* Disagreeing, the supreme court held that there was privity between the plaintiffs and prior owners and that the claims were barred on the basis of *res judicata*. 919 S.W.2d at 653. Consequently, it did not address the limitations issue or the court of appeal's assumption that knowledge could be imputed. These holdings, relating to consideration of imputed knowledge in determining the applicability of the discovery rule, are consistent with those of other jurisdictions. *See also Bennett v. Johnson*, 485 N.W.2d 481, 483 (Iowa App. 1992), and *Gilbert v. Sacred Heart Medical Ctr.*, 127 Wash.2d 370, 900 P.2d 552, 553–54 (1995) (both holding that knowledge can be imputed for purposes of the discovery rule). *But see BASF Corp. v. Symington*, 512 N.W.2d 692, 697 (N.D.1994) (knowledge of parent may not be imputed to minor plaintiff).

---

4. The portion of the congressional report cited by Deloitte was the last sentence in a paragraph outlining the actual notice provisions of section 6223.

Thus, having determined that knowledge of an injury for purposes of the discovery rule can be constructive, we must next determine whether the existence of a limited partnership is sufficient to impute the knowledge of a general partner to the limited partners.

It has long been the rule that knowledge of a partner is imputed to the partnership. This rule has been statutorily recognized in Section 12 of the Texas Uniform Partnership Act. Tex.Rev.Civ. Stat. Ann. art. 6132b (Vernon 1970 & Supp.1998).[5] Here, however, suit was not brought by the partnership but by the limited partners individually. Consequently, the rule imputing knowledge of a partner to a partnership is inapplicable.

■ Deloitte fails to cite any Texas case holding that notice to one partner is imputed to each of the other partners individually. It does cite *Wakefield v. Bevly*, 704 S.W.2d 339 (Tex.App.—Corpus Christi 1985, no writ), as support for the statement in its motion for rehearing that "notice to one partner will commence the limitations period in a suit by all partners." We do not agree the decision supports that statement. The *Wakefield* court merely applied the rule noted above that "[n]otice to any partner [ ] is notice *to the partnership.*" *Id.* at 346 (emphasis added).

In *Avinger v. Campbell*, 499 S.W.2d 698 (Tex.Civ.App.—Dallas 1973), *writ ref'd n.r.e. per curiam*, 505 S.W.2d 788 (Tex.1974), the Dallas Court of Appeals held that notice to some partners would not be notice to other partners. 499 S.W.2d at 703. However, that case is different from the one before us because it involved the imputation of one limited partner's knowledge to another limited partner. Parenthetically, the Dallas court failed to cite authority for that holding.

*Offering some support for Deloitte's position are Napper v. Johnson*, 464 S.W.2d 496 (Tex.Civ.App.—Waco 1971, writ ref'd n.r.e.), and *Gaynier v. Ginsberg*, 715 S.W.2d 749 (Tex.App.—Dallas 1986, writ ref'd n.r.e.). In *Napper*, a homeowner sought the advice of an attorney named Pritchard in an effort to

avoid foreclosure on his home. Pritchard prepared a deed transferring the property to another of Pritchard's clients, Johnson, in exchange for $15,000 and an option to repurchase the property within six months. Pritchard then paid Johnson for a half interest in the property. The question before the Waco court was whether Johnson knew that the homeowner intended the instrument to be a mortgage rather than a deed. In holding that Johnson knew or should have known of the homeowner's intent, the court implied a partnership between Pritchard and Johnson and based on that partnership reasoned that "Pritchard's knowledge is binding on Johnson." 464 S.W.2d at 498.

However, several differences in the facts before the *Napper* court and those before us persuade us that the holding of that case does not conclusively resolve the issue before us. First, similar to the failure of *Avinger* to do so, the *Napper* court cites no authority in support of the cited proposition. Second, since Pritchard was Johnson's attorney, and therefore his agent, the opinion's result was supportable on the well established rule that a principal is charged with the knowledge of his agent. *See, Farmer Enterprises, Inc. v. Gulf States Ins. Co.*, 940 S.W.2d 103, 111 (Tex.App.—Dallas 1996, no writ); Restatement (Second) of Agency, § 268. Third, there was evidence that Johnson had actual knowledge of the homeowner's intent. 464 S.W.2d at 498.

As did the facts in *Napper*, the *Gaynier* case also involved the obligations flowing from an attorney to his client. The attorney/defendant in *Gaynier* was denied a summary judgment based on his professional relationship with the plaintiff. In extending the denial of summary judgment to the other participants in a joint venture in which the attorney was involved, the court held that joint venturers are charged with the knowledge of their co-venturer. In doing so, the court relied on *Napper* and *Dial Temp Air Cond. Co. v. Faulhaber*, 340 S.W.2d 82 (Tex. Civ.App.—Dallas 1960, writ ref'd n.r.e.). As with *Napper*, the party with actual knowl-

---

5. Because the Texas Revised Limited Partnership Act does not specifically address this question, the Texas Uniform Partnership Act is applicable.

Tex.Rev.Civ. Stat. Ann. art. 6132a–1, § 13.03 (Vernon Supp.1998).

edge was also acting in the role of attorney for the joint venture. Parenthetically, *Dial Temp* merely held that an attorney's knowledge is imputed to their client. *Id.* at 87.

Because the parties to whom Deloitte seeks to have GMC's knowledge imputed are limited partners, the facts in the *Avinger* case are more closely analogous to the facts before us than are those in either the *Napper* or *Gaynier* cases. In *Avinger,* however, the parties with actual knowledge were other limited partners. Here, of course, the party with actual knowledge, GMC, was the sole general partner. Because of the indicated uncertainty of Texas law on this issue, and the fact that both the Texas Revised Limited Partnership Act [6] and Texas Uniform Partnership Act [7] are uniform acts and should be construed to make uniform the law of those states enacting similar provisions, we must consider the decisions by the courts of other jurisdictions.

We have discovered four cases in which courts have held that the knowledge of one partner is imputed to the other partners. They are: *BMS Partnership v. Winter Park,* 910 P.2d 61 (Colo.Ct.App.1995); *South Union v. George Parker & Assoc.,* 29 Ohio App.3d 197, 504 N.E.2d 1131 (1985); *Lee v. Durango Music,* 144 Colo. 270, 355 P.2d 1083 (1960); and *Stork Restaurant v. Sahati,* 166 F.2d 348 (9th Cir.1948). None of those cases involved the discovery rule and most involved general partnerships. For example, *Lee* involved two general partners who were also spouses. 355 P.2d at 1086. Only *BMS Partnership* involved a limited partnership. The Colorado Court of Appeals held that the knowledge of a general partner is imputed to the limited partners. 910 P.2d at 63.

The defining characteristic of a limited partner is the lack of participation in the management or control of the partnership. Tex.Rev.Civ. Stat. Ann. art. 6132a–1, § 3.03 (Vernon Supp.1998). Even though that lack of participation in partnership management raises some question about the fundamental fairness of imputing the knowledge of general partners to limited partners, the weight of

authority is to impute that knowledge. Thus, the authority discussed above persuades us that limited partners are deemed to know the facts known by the general partners. That being so, appellees are charged with knowledge of the IRS FPAA on the date it was received by the general partner, GMC. That knowledge stopped the delaying effect of the discovery rule. Thus, because that date was more than two years before suit was filed, the action is time barred and we must sustain Deloitte's first point.

Accordingly, the judgment of the trial court is reversed and judgment rendered that appellees take nothing by their suit. Tex.R.App. P. 43.2(c).

---

**6.** Tex.Rev.Civ. Stat. Ann. art. 6132a–1, § 13.01(a)(b) (Vernon Supp.1998).

**7.** Tex.Rev.Civ. Stat. Ann. art. 6132b, § 4(4) (Vernon 1970).